**SAXENA WHITE P.A.**
MAYA SAXENA
(msaxena@saxenawhite.com)
JOSEPH E. WHITE, III
(white@saxenawhite.com)
LESTER R. HOOKER (Bar No. 241590)
(lhooker@saxenawhite.com)
150 East Palmetto Park Road
Suite 600
Boca Raton, Florida 33432
Tel:     (561) 394-3399
Fax:     (561) 394-3382

-and-

STEVEN B. SINGER
(ssinger@saxenawhite.com)
SARA DILEO
(sdileo@saxenawhite.com)
JOSHUA H. SALTZMAN
(jsaltzman@saxenawhite.com)
10 Bank St.
8th Floor
White Plains, New York 10606
Tel:     (914) 437-8551
Fax:     (888) 631-3611

*Lead Counsel for Plaintiff and the Class*

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
DAVID R. STICKNEY (Bar No. 188574)
(davids@blbglaw.com)
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

-and-

AVI JOSEFSON
(avi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Local Counsel for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Case:  18-cv-05181-VC |
| Plaintiff, | AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. | JURY TRIAL DEMANDED |
| NEVRO CORP., RAMI ELGHANDOUR, and ANDREW GALLIGAN, | |
| Defendants. | |

AMENDED CLASS ACTION COMPLAINT
Case No. 18-cv-05181-VC

1

## TABLE OF CONTENTS

2   I.      NATURE OF THE ACTION ........................................................................... 1

3   II.     INTRODUCTION ........................................................................................... 2

4   III.    JURISDICTION AND VENUE ..................................................................... 5

5   IV.     PARTIES ........................................................................................................ 5

6   V.      OVERVIEW OF THE FRAUD ...................................................................... 7

7           A.    Background of Nevro and the SCS Industry ...................................... 7

8           B.    Nevro Repeatedly Touts its "Proprietary" Technology as a Key Advantage ........ 8

9           C.    Nevro Stole Key Features of Its Technology from Boston Scientific ................. 9

10          D.    Nevro Poaches Dozens of Former Boston Scientific Scientists and
                  Engineers, Including At Least Six Pivotal Employees Who Stole
11                Confidential Trade Secrets ................................................................. 10

12          E.    Nevro's Own Counsel Discovers Nevro Employees' Theft of Boston
                  Scientific's Proprietary Trade Secrets ............................................... 16

13  VI.     THE TRUTH IS REVEALED ...................................................................... 17

14          A.    Armed With Documentary Evidence of Nevro's Trade Secret Theft
15                Boston Scientific Initiates the Delaware II Action ........................... 17

16          B.    Documentary Evidence Obtained Through Extensive Discovery
                  Substantiates Nevro's Trade Secret Theft ......................................... 19

17          C.    The Market Reacts To The Revelations of Nevro's Trade Secret Theft ............ 22

18  VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ....... 23

19          A.    Second Quarter 2017 Statements ...................................................... 24

20          B.    Third Quarter 2017 Statements ......................................................... 26

21          C.    Statements Regarding the FDA's Approval of Senza II ..................... 27

22          D.    Fourth Quarter and Full Year 2017 Statements ................................ 27

23          E.    First Quarter 2018 Statements .......................................................... 29

24  VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER .................................... 31

25  IX.     CLASS ACTION ALLEGATIONS ............................................................ 33

26  X.      UNDISCLOSED ADVERSE FACTS .......................................................... 34

27

XI.      LOSS CAUSATION............................................................................... 35

XII.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-
         MARKET DOCTRINE) ......................................................................... 37

XIII.    NO SAFE HARBOR .............................................................................. 39

XIV.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT.................................40

         First Claim ........................................................................................... 39

         Second Claim........................................................................................ 43

XV.      PRAYER FOR RELIEF .......................................................................... 44

XVI.     JURY TRIAL DEMANDED ................................................................... 44

## I.       NATURE OF THE ACTION

1.       Lead Plaintiff Oklahoma Police Pension and Retirement System ("Lead Plaintiff" or "Plaintiff"), on behalf of itself and all others similarly situated, alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel.  Many of the facts related to Lead Plaintiff's allegations are known only by Defendants or are exclusively within Defendants' custody or control.   Lead Plaintiff's investigation included, among other things, review and analysis of: (a) public filings made by Nevro Corp. ("Nevro" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by Defendants and other related non-parties; (c) news articles, shareholder communications, conference call transcripts, and postings on Nevro's website concerning the Company's public statements; (d) information filed on the dockets of various cases involving Nevro and certain Company employees; (e) data reflecting the pricing of Nevro common stock; and (f) other publicly available information concerning Nevro and the Individual Defendants. Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

2.       Lead Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendant Nevro and Defendants Rami Elghandour ("Elghandour"), and Andrew Galligan ("Galligan") (the "Individual Defendants," and together with Nevro, "Defendants"), and Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of all investors who purchased or otherwise acquired Nevro common stock between August 8, 2017 and June 29, 2018, inclusive (the "Class Period").

II.     **INTRODUCTION**

3.      Nevro is a medical device company that develops technology for the treatment of chronic pain.  The Company's sole product and only source of revenue is a spinal cord stimulation ("SCS") system called "Senza," which is surgically implanted in patients and alleviates chronic pain by delivering high frequency electrical stimulation to a patient's spine. Senza is purportedly unique and superior to other SCS systems because its high frequency stimulation alleviates pain at a higher efficacy rate without causing considerably unpleasant and uncomfortable side-effects such as tingling, numbness, and buzzing sensations.  Throughout the Class Period, Defendants repeatedly touted Senza's "proprietary technology" and "extensive intellectual property" as a "competitive advantage," and assured investors that this "once in a generation" therapy was the primary differentiating factor setting the Company apart from its major competitors.   Sophisticated market participants accepted Defendants' claims.   For instance, a March 2017 Cannacord Genuity report on Nevro emphasized that the Company's "revolutionary Senza SCS system" was a "truly disruptive technology in one of the largest markets in all of Med-Tech, chronic pain," and stated that the proprietary nature of the technology should "maintain [Nevro's] monopolistic hold on the high frequency therapy realm in SCS through 2030."   Fueled by Defendants' representations, the Company's stock price substantially increased, reaching a Class Period high of $93.31 on October 5, 2017.

4.      Defendants' statements were materially false and misleading.  In reality, Nevro's purportedly "proprietary technology" was founded upon a years-long, fraudulent scheme to steal trade secrets from one of the Company's main competitors, Boston Scientific Corporation ("Boston Scientific").   Specifically, in recent years, Nevro poached dozens of key Boston Scientific scientists and engineers who were instrumental developers of critical Boston Scientific SCS technologies, all in a concerted effort to misappropriate confidential and proprietary trade secret information and use it to develop and advance Nevro's Senza product.   Notably, Defendants' scheme was revealed through documents and communications that Nevro's own counsel discovered and disclosed in a series of patent infringement lawsuits between Nevro and

Boston Scientific regarding the very technology upon which Senza is based.  Indeed, during discovery in the various litigations, Nevro's counsel uncovered evidence that numerous Nevro scientists *stole tens of thousands of documents* containing Boston Scientific's confidential and proprietary trade secret information, which they then shared with Nevro employees.

5.      Indeed, in a series of e-mails and letters to counsel for Boston Scientific beginning on August 18, 2017, *Nevro's own counsel* acknowledged that James Thacker ("Thacker")—Nevro's current Director of Clinical Field Engineering and a former Boston Scientific Manager of Field Clinical Engineering—had stolen approximately *35,000 documents* containing confidential and proprietary trade secret information upon his exit from Boston Scientific.  Thacker had accessed that information in connection with work he performed for Nevro on several occasions, and he had shared these documents with other employees at the Company.  Significantly, during his tenure at Boston Scientific, Thacker worked on technology that included high frequency electrical stimulation—the same technology that is the foundation of Nevro's Senza system.

6.      Remarkably, Nevro's trade secret theft was not limited to Thacker.  Just two months later, on October 30, 2017, Nevro's counsel once again was compelled to disclose that ongoing discovery had revealed *three additional major instances of trade secret theft* by key former Boston Scientific executives also poached by Nevro, including a Director of Clinical Marketing and a Senior Field Clinical Engineer who were listed as inventors or co-inventors of numerous Boston Scientific SCS system patents, and who, like Thacker, also worked on high frequency SCS technology for Nevro's competitor.  In response to these revelations, Boston Scientific sent Nevro correspondence on November 3, 2017, identifying 33 additional former Boston Scientific engineers and other executives then-employed by Nevro, requesting forensic searches for stolen Boston Scientific documents, and stating that "the number of former [Boston Scientific] employees who have appeared to [. . .] improperly possess confidential [Boston Scientific] information [. . .], is obviously troubling."

7. In the wake of Nevro's confirmation that its employees had confiscated tens of thousands of confidential Boston Scientific documents, on April 27, 2018, Boston Scientific initiated its second patent infringement action against Nevro in the United States District Court for the District of Delaware, which included claims for theft of trade secrets and tortious interference with contract, and which was buttressed by the extensive evidentiary record obtained through discovery in the prior litigation, including thousands of internal and confidential Boston Scientific documents and deposition testimony. Analysts immediately reported on the filing, including the documentary evidence supporting Boston Scientific's allegations that Defendants intentionally "institutionalized the extensive knowledge of Boston Scientific's patent portfolio" by using the stolen trade secret information provided by these employees "in connection with . . . <u>its research and development, design, clinical investigation, and testing of the Senza Systems</u>." The implications for the Company were clear, and the documentation supporting Boston Scientific's lawsuit was substantial. Indeed, a Wells Fargo report discussing the lawsuit opined that the evidence-backed allegations could very well lead the Delaware court to "reverse the unfair advantage as best it could, whether by imposing delays in future product releases, financial repercussions, or other interventions."

8. On this news, Nevro's share price declined $1.46 per share, from a close of $90.82 per share on April 27, 2018 to a close of $89.36 per share on April 30, 2018—wiping out $44 million in the Company's market capitalization in one trading day.

9. Just two months later, on July 2, 2018, Nevro investors were shocked again when Morgan Stanley & Co. downgraded Nevro to "Equal Weight," explaining that "Boston Scientific litigation [] are risks to Senza superiority" and that "potential risks to [Senza] therapy's differentiation later this year warrant the discount." On this news, Nevro's stock price dropped another $6.62 per share, or 8.29%, from a close of $79.85 per share on June 29, 2018 to a close of $73.23 per share on July 2, 2018, on high trading volume of more than 2 million shares, wiping out $200 million in market capitalization.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## III.     JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal place of business is located in this District at 1800 Bridge Parkway, Redwood City, California, 94065.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.     PARTIES

15.     Lead Plaintiff Oklahoma Police Pension and Retirement System, as set forth in the accompanying certification incorporated by reference herein, purchased Nevro common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Nevro Corp. is a corporation organized under the laws of the State of Delaware and maintains its principal executive offices at 1800 Bridge Parkway, Redwood City, California, 94065.  Nevro's common stock trades on the New York Stock Exchange ("NYSE")

under the symbol "NVRO."  Nevro is a medical device company whose sole products are spinal cord stimulation ("SCS") systems called "Senza I" and "Senza II" (collectively referred to herein as the "Senza systems" or "Senza").  Nevro was initially incorporated in March 2006 in Minnesota under the name "NBI Development, Inc."  In October 2006, the Company was re-incorporated in Delaware and in June 2007 the Company changed its name to Nevro Corp. Nevro's initial public offering of common stock in the U.S. (the "IPO") took place in November 2014, and it first received approval from the U.S. Food and Drug Administration ("FDA") to commercialize Senza in the U.S. in May 2015.

17.    Defendant Rami Elghandour ("Elghandour") joined Nevro in 2012, has served as Nevro's Chief Business Officer and President, and as of June 1, 2016, as Nevro's President and Chief Executive Officer, which positions he continues to hold today.  During the Class Period, Defendant Elghandour reviewed, approved, and signed Nevro's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on August 7, 2017, November 6, 2017, February 22, 2018 and May 7, 2018, which contained materially false and misleading statements and omissions.  In addition, Defendant Elghandour participated in an earnings call in which materially false and misleading statements and omissions concerning Nevro were disseminated.

18.    Defendant Andrew Galligan ("Galligan") joined Nevro in 2010 as its Chief Financial Officer ("CFO") and remained CFO of the Company at all relevant times.  During the Class Period, Defendant Galligan reviewed, approved, and signed Nevro's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on August 7, 2017, November 6, 2017, February 22, 2018 and May 7, 2018, which contained materially false and misleading statements and omissions.

19.    Defendants Elghandour and Galligan (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Nevro's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged

herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pled herein.

## V.       OVERVIEW OF THE FRAUD

### A.       Background of Nevro and the SCS Industry

20.     Nevro is a global medical device company focused on developing and commercializing devices designed to treat patients suffering from chronic pain.  Nevro's sole product is a spinal cord stimulation ("SCS") system, sold under the brand name "Senza" and available in two iterations, Senza I and Senza II.

21.     SCS therapy involves the surgical implantation of a device that sends electrical pulses through the patient's spine in order to alleviate chronic pain.  Traditional SCS devices mask pain by creating a tingling or numbing sensation known as paresthesia.  Paresthesia is a major problem for patients, as it is unpleasant and can limit activity and mobility.  In contrast to competing SCS products, Nevro's Senza systems purport to use "proprietary" high-frequency electrical stimulation—which the Company refers to as "HF10 therapy"—to alleviate pain without causing paresthesia.  Accordingly, Nevro claims that its "proprietary technology" provides the Company with a key competitive advantage and a differentiating factor over its SCS competitors like Boston Scientific, Abbott, and Medtronic.

22.     Nevro first began marketing a version of its Senza product in Europe in 2010. However, 80% of the market for SCS systems is in the United States.  Thus, in May 2012, Nevro began a 24-month pivotal clinical study for the purpose of gaining FDA approval to market Senza I in the U.S.  Nevro completed its study in March 2014, and filed for its IPO in November 2014.  In May 2015, Senza I gained FDA approval and Nevro began selling its product in the

1   United States shortly thereafter.  Nevro's U.S. sales quickly grew from $24 million in 2015 to

2   $173 million in 2016 to $263.6 million in 2017, as Nevro's Senza systems gained market share

3   in the multi-billion-dollar U.S. SCS systems market.

**B.    Nevro Repeatedly Touts its "Proprietary" Technology as a Key Advantage**

5       23.    Prior to and throughout the Class Period, Nevro specifically touted its

6   "proprietary" HF10 technology as Senza's key competitive advantage over other SCS devices.

7   Indeed, Nevro's press release announcing FDA approval of Senza I touted "the unique nature of

8   the technological innovation," making it "meaningfully superior to traditional SCS therapy."

9   Indeed, analysts highlighted Nevro's purportedly "proprietary" technology as a key reason for

10  their investment recommendations.  For example, a May 11, 2015 CRT Research report about

11  Nevro stated:  "In our view, a differentiated product platform, supported by powerful IP, bolsters

12  Nevro's competitive position meaningfully.  Nevro's superior growth profile and technological

13  edge warrant a premium to the group."

14      24.    On August 7, 2017—the day before the start of the Class Period—Nevro put out a

15  press release announcing the Company's earnings for the second quarter of 2017 that stated:

16  "Nevro has developed and commercialized the Senza spinal cord stimulation (SCS) system, an

17  evidence-based neuromodulation platform for the treatment of chronic pain.  The Senza System

18  is the only SCS system that delivers Nevro's proprietary HF10 therapy."

19      25.    Similar statements also appeared in the Company's quarterly and annual SEC

20  filings during the Class Period.  For example, the Company's Annual Report on Form 10-K for

21  the year ended December 31, 2017, filed with the SEC on February 22, 2018, stated that Nevro

22  had "built competitive advantages through our proprietary technology," and that its "proprietary

23  HF10 therapy…allows for pain relief without paresthesia [and] delivers proprietary waveforms

24  at 10,000 Hz pulse rate with a statistically driven and clinically verified programming

25  algorithm."  Also on February 22, 2018, during the earnings call discussing Nevro's financial

26  results for the fourth quarter and full year 2017, Defendant Elghandour boasted that Senza was

27  "a truly once in a generation medical technology innovation."

28  AMENDED CLASS ACTION COMPLAINT
Case No. 18-cv-05181-VC                                                                        -8-

26.     Defendants' representations regarding the unique and proprietary nature of Nevro's Senza systems delivering HF10 therapy had the intended effect, as sophisticated market participants fully embraced the apparently unique investment opportunity that Nevro provided. For instance, in a January 25, 2018 analyst report discussing Nevro's outlook for 2018, Morgan Stanley reported "[w]e continue to see Nevro taking share this year with its differentiated HF therapy[.]"  And a February 22, 2018 BMO Capital Markets report echoed more of the same: "The US SCS market is rocking, increasing 20%+, with new awareness, new technologies, and Nevro is leading the way with its next-generation devices [i.e., Senza II] . . . With its pedal to the metal we reiterate our Outperform rating on NVRO shares."

**C.     Nevro Stole Key Features of Its Technology from Boston Scientific**

27.     In stark contrast to Nevro's repeated claims that it had "developed" a "proprietary" and "once in a generation" high-frequency SCS technology that gave it a competitive edge in the market, in reality, Defendants copied the technology underlying Senza from a main competitor through an orchestrated, years-long practice of stealing confidential trade secrets from Boston Scientific.

28.     Specifically, in 2004, more than six years before Nevro's Senza came to market in Europe, Boston Scientific launched its first SCS product—the "Precision Plus® SCS system" ("Precision").  Boston Scientific's Precision system was substantially similar to Nevro's later-developed Senza systems in that both were implantable devices that used essentially the same mechanism to alleviate chronic pain by sending electrical pulses through the spine.  The only purported difference between the products was that Precision was typically programmed to deliver low-frequency electrical pulses, whereas Senza was typically programmed to deliver high-frequency electrical pulses for the purpose of eliminating paresthesia.  However, crucially, as of 2004, Boston Scientific's Precision device was fully capable of delivering high frequency electrical pulses and alleviating chronic pain without paresthesia—the same features Nevro has since touted as "proprietary."  Indeed, Precision had been designed to be configurable for this very purpose.

29.     Boston Scientific's technology became the foundation for Nevro's subsequent Senza systems through a years-long effort to poach senior engineers and other executives from Boston Scientific.  Beginning no later than August 2007, Nevro hired dozens of former Boston Scientific key SCS engineers, scientists, patent inventors, product developers, and other employees with critical industry knowledge, and used them to further the development of Senza. Indeed, as was later revealed, several of these key scientists and engineers not only brought with them in-depth knowledge of Boston Scientific's SCS technology, but <u>tens of thousands of stolen documents</u>, which they then shared with other Nevro employees and used in their work on Nevro's Senza systems.

30.     Significantly, Boston Scientific did not become aware of Nevro's misappropriation of trade secrets until much later.  In recent years, Nevro and Boston Scientific have become embroiled in multi-national patent-related litigation before this Court, in the District of Delaware and in Europe.[1]  Boston Scientific first learned of most of these instances of misappropriation when, during the course of discovery in the California Action, Nevro's own attorneys confirmed them through letters exchanged with counsel for Boston Scientific beginning in August 2017.

**D.      Nevro Poaches Dozens of Former Boston Scientific Scientists and Engineers, Including At Least Six Pivotal Employees Who Stole Confidential Trade Secrets**

31.     In particular, <u>six</u> key former Boston Scientific employees who worked extensively on Boston Scientific's SCS technologies were <u>critical</u> to the development of Nevro's Senza product, and used stolen proprietary information in order to further that development.

---

[1] On November 28, 2016 Nevro commenced a patent infringement action against Boston Scientific in this Court, captioned *Nevro Corp. v. Boston Scientific Corp., et al.*, 16-cv-06830-VC (N.D. Cal.) (the "California Action").  On July 24, 2018, this Court granted summary to Boston Scientific.  On December 9, 2016, Boston Scientific commenced its own patent infringement case against Nevro in the District Court of Delaware, captioned *Boston Scientific Corp., et al. v. Nevro Corp.*, 16-cv-01163 (D. Del.) (the "Delaware I Action").  Presently, the Delaware I Action has been stayed.

32.   *James Makous*.   No later than August 2007, Nevro hired James Makous ("Makous") as its Director of Preclinical Research.   Makous's prior position had been as Director, Field Clinical Engineering at Advanced Bionics Corporation—the predecessor of Boston Scientific's SCS business that Boston Scientific acquired in 2004 (Advanced Bionics Corporation and Boston Scientific are collectively referred to herein as "Boston Scientific").   As documentary evidence produced in the California Action later revealed, and <u>as Nevro's counsel has admitted</u>, Makous stole documents containing proprietary and confidential trade secret information from Boston Scientific and brought them to Nevro.   (*See, e.g.*, California Action, ECF No. 203-7.)   Makous then used that information to further the development of Senza. Indeed, Makous was an inventor of key patents both for Boston Scientific's Precision system, and for Nevro's Senza systems.

33.   *James Thacker*.   No later than January 2009, Nevro hired James Thacker ("Thacker"), who previously served as Boston Scientific's Manager of Clinical Field Engineering from April 2000 to August 2006.[2]   During that time, Thacker led Boston Scientific's field clinical engineering group, which helped to develop, administer and analyze critical studies regarding Boston Scientific's SCS technology and worked in conjunction with the research and development group to develop, test, and commercialize Boston Scientific's core SCS technologies.   Significantly, Thacker was not only critical in the development of Boston Scientific's Precision system, but, as documentary evidence produced in the California Action later revealed, he took part in meetings specifically for the purpose of discussing how Precision could be programmed to deliver electrical stimulation at 10,000 Hz—the same high frequency later claimed to be "proprietary" by Nevro.[3]

---

[2] https://www.linkedin.com/in/jrthacker

[3] *See, e.g.,* California Action, ECF No. 318-5 ("This meeting is to discuss the requirements for an "EM3" or Clinical Research System (CRS).  This is a souped-up version of EM2.1, where we have new software (and possibly hardware?) that can implement features of which the Precision system is capable but are not now being clinically employed.  Things such as:- prepulsing,- very high rate (-10kHz)- new Navigator tables/algorithms- RC-based Navigation." (emphasis added)).

34.     Further, Thacker was listed as an inventor or co-inventor on numerous patents critical to Boston Scientific's Precision devices <u>and</u> on multiple patents critical to Nevro's Senza systems, including several patents <u>specifically concerning Senza's ability to use high frequency stimulation in order to avoid paresthesia</u>.

35.     Moreover, <u>as Nevro's own counsel has admitted</u>, and as confirmed by documents Thacker produced in discovery in the California Action, Thacker <u>stole approximately 35,000 documents containing proprietary and confidential trade secret information regarding Boston Scientific's SCS technology before he left Boston Scientific</u>.[4]   Evidence revealed in the California Action also has shown that Thacker later accessed those same stolen documents at Nevro by inserting a Boston Scientific-owned thumb drive into his Nevro laptop on several occasions.[5]   Further, evidence has shown that, during 2009, Thacker disseminated critical documents belonging to Boston Scientific concerning its SCS technology to Nevro employees.[6] For example, on April 16, 2009, Thacker emailed a document titled "Stimulus™ Confirmatory Study," the detailed protocol used by Boston Scientific during its clinical investigation of Precision, to a Nevro colleague.  And on May 4, 2009, Thacker emailed another document to a different Nevro employee titled "Spinal Cord Stimulator Clinician's Programming System, Module Specification," which, *inter alia*, detailed the specifications used to program the Precision system to emit electrical stimulation at high frequencies—the very aspect of Boston Scientific's Precision systems that Nevro later claimed was "proprietary" to its Senza systems.

36.     *Wesley Park*.  Wesley Park ("Park") was employed by Boston Scientific from 2005 through 2008, where he managed key projects relating to Boston Scientific's Precision system.  No later than January 2009, Nevro hired Park as Head of Global Clinical Research Programs—Executive Staff, where he "developed high frequency therapy algorithms" and later

---

[4] *See, e.g.,* California Action, ECF Nos. 202-14, 202-18.

[5] *See* California Action, ECF No. 193-9.

[6] *See* California Action, ECF No. 202-16.

"managed and successfully complet[ed a] U.S. pivotal study which led to FDA approval" of Senza in 2015.[7]  Critically, Park used the knowledge and proprietary information he acquired at Boston Scientific to co-author for Nevro, along with Thacker, many patents critical to Senza, including several patents <u>specifically concerning Senza's ability to use high frequency stimulation in order to avoid paresthesia</u>.

37.   Like Makous and Thacker, <u>as Nevro's own counsel has admitted</u>, and as confirmed by documents produced in the California Action, Park stole a hard drive with thousands of critical documents containing confidential and proprietary trade secret information concerning Boston Scientific's SCS technology and brought them to Nevro.[8]   Further, documentary evidence made public has already shown that Park was involved in the transmission of the critical "Stimulus™ Confirmatory Study" document emailed to him by Thacker in mid-2009.

38.   *David Marco*.   No later than January 2009, Nevro also hired David Marco ("Marco"), who had previously worked at Boston Scientific as a Field Clinical Engineer, where he helped Boston Scientific complete an FDA clinical trial of its Precision system.[9]   Nevro hired Marco as a Principal Field Clinical Engineer, and he worked for Nevro on "patient testing, research, clinical trials, and supporting development efforts" relating to Nevro's Senza product. Like Makous, Thacker and Park, <u>as Nevro's counsel has admitted</u>, Marco also stole Boston Scientific documents containing proprietary and confidential trade secret information, retained them on an external hard drive, and brought them to Nevro.[10]   Further, Marco was involved in the transmission of the critical "Spinal Cord Stimulator Clinician's Programming System, Module Specification" document emailed to him by Thacker in mid-2009.

---

[7] https://www.linkedin.com/in/wesleypark/

[8] *See* California Action, EFC Nos. 203-7, 203-16.

[9] https://www.linkedin.com/in/david-marco-513251a/

[10] *See* California Action, EFC No. 203-7.

39.     *Kerry Bradley*.    No later than August 2013, Nevro hired Kerry Bradley ("Bradley") as Senior Director, Research.   Bradley previously worked at Boston Scientific, where he was the inventor or co-inventor on <u>19 different SCS system patents</u>, all relating to Boston Scientific's Precision devices.   Bradley had also led a team of scientists to "investigate [a] wide range of neuromodulation therapies and targets" as well as design and execute clinical studies, undertake computational modeling, and other key tasks relating to Boston Scientific's development of its SCS devices.[11]   Indeed, an internal Boston Scientific email disclosed in discovery in the California Action described Bradley as "<u>likely the most knowledgeable person of SCS clinical experience and science in [Boston Scientific]</u>" and stated that Bradley "<u>is the one that drove many of the early studies…that helped us develop the algorithms to troll stimulation…In fact, he created that algorithm</u>."[12]   The email further stated that Bradley "<u>has been a proponent for years of the high [frequency] rate study that we are now trying to accelerate</u>,"—i.e. a study on the same high-frequency technology that Nevro has since claimed is "proprietary."[13]

40.     Further, documents have revealed that Bradley participated in the same 2005 meeting as Thacker during which Boston Scientific employees specifically discussed how Precision devices could be programmed to deliver stimulation pulses with a frequency of 10,000 Hz—the same high frequency utilized by Nevro's Senza systems delivering HF10 therapy.[14]   At Nevro, Bradley used confidential and proprietary knowledge he acquired at Boston Scientific in his leading of a research team focused on mechanisms of action for Nevro's HF10 therapy, and in his authoring or co-authoring of numerous key patents used in Nevro's Senza devices.

41.     *Dongchul Lee*.    No later than November 2013, Nevro hired Dongchul Lee ("Lee") as Director of Theoretical Research.   Lee was previously employed by Boston Scientific as a

---

[11] https://www.linkedin.com/in/kerry-bradley-9305168

[12] California Action, ECF No. 202-8 (emphasis added).

[13] *Id.* (emphasis added).

[14] *See* California Action, ECF No. 318-5.

Principal Research Scientist, where he was a key member of the team conducting neuromodulation research for Boston Scientific's SCS systems.   As later revealed during discovery in litigation between Boston Scientific and Lee,[15] Lee stole approximately 20,000 confidential and proprietary documents from Boston Scientific by copying them to his personal hard drive.   Lee then brought those documents with him and accessed those documents in connection with his work for Nevro.[16]   Among other things, these documents included a highly confidential research study protocol relating to SCS therapy, as well as unpublished research data.

42.   While at Boston Scientific, Lee authored or co-authored numerous key patents relating to SCS therapy, including patents specifically relating to the provision of SCS therapy without creating paresthesia—one of the key features Nevro later claimed as "proprietary." Further, while at Boston Scientific, Lee had access to key areas of confidential and proprietary SCS-related knowledge, each of which was crucial to the development of Nevro's Senza technology.   For example, Lee had access to Boston Scientific's studies of the mechanism of action for SCS, and had, in fact, led a research effort to investigate the sensations felt by patients during SCS therapy—information highly relevant to the development of paresthesia-free therapy. Further, Lee worked extensively on developing key algorithms used in programming SCS devices—algorithms that would be crucial to enabling the SCS devices to operate at higher frequencies.   Lee not only brought this confidential and proprietary information with him to

---

[15] On December 13, 2013, Boston initiated a lawsuit against Lee, asserting claims of breach of contract and trade secret misappropriation, captioned *Boston Scientific Corp. v. Dongchul Lee*, 13-cv-13156-DJC (D. Mass.) (the "Lee Action").   Although Nevro was not a party to the Lee Action, Defendants undeniably were aware of it and Defendant Elghandour even submitted his own affidavit confirming his awareness of the proceedings and documents produced in discovery.  *See, e.g.,* Lee Action, ECF No. 19.

[16] *See, e.g.,* Lee Action, ECF No. 88-1 (affidavit submitted by Chief Technology Officer of computer forensic services company, attesting "we have now been able to determine that an extensive set of materials (about 3300 files) was copied from Dr. Lee's Boston Scientific Lenovo X220 laptop and subsequently transferred to Dr. Lee's Nevro laptop" and that these files "were opened on Dr. Lee's Nevro computer after Dr. Lee joined Nevro").

Nevro, but specifically announced his intention to continue working on this same SCS technology while working at Nevro.[17]

### E.     Nevro's Own Counsel Discovers Nevro Employees' Theft of Boston Scientific's Proprietary Trade Secrets

43.     During the course of discovery in the California Action, Nevro's counsel discovered documentary evidence of Nevro's theft of trade secrets described above. Specifically, no later than August 2017, Nevro's counsel learned that Thacker had stolen documents during his employment with Boston Scientific, and had accessed them at Nevro.

44.     On August 18, 2017, Nevro's counsel disclosed to counsel for Boston Scientific that "[i]t has come to our attention that Jim Thacker was in possession at his home of documents from his period of employment at Boston Scientific." (California Action, ECF No. 202-14.)

45.     On August 31, 2017, Nevro's attorneys informed counsel for Boston Scientific that Nevro had agreed to "produce the documents relating to the hiring and onboarding of Mr. Thacker," provide "Mr. Thacker's project list from his first two years at Nevro," and "conduct a reasonable search to determine whether Mr. Thacker distributed any confidential [Boston Scientific] documents to other Nevro personnel." (California Action, ECF No. 202-14.)

46.     On September 15, 2017, Nevro agreed to "mov[e] forward with searching Mr. Thacker's emails" for documents or communications containing confidential and proprietary trade secret information belonging to Boston Scientific, including conducting searches "to determine whether Mr. Thacker inserted the thumb drives [containing stolen Boston Scientific information] into computers he had access to at Nevro." (California Action, ECF No. 202-14.)

47.     In October 2017, communications between Nevro's counsel and Boston Scientific's counsel confirmed that Thacker "sent BSC confidential information to Nevro employees" on multiple occasions shortly after the commencement of his tenure at Nevro, and

---

[17] *See, e.g.,* Lee Action, ECF No. 122 ¶ 1.

indeed was still continuing to access such confidential and proprietary information on his Nevro-issued laptop as late as April 2015.  (California Action, ECF Nos. 193-9; 202-18.)

48.    Remarkably, later that same month on October 30, 2017, Nevro's attorneys admitted to counsel for Boston Scientific that *three more* former Boston Scientific employees had stolen documents containing Boston Scientific's confidential and proprietary trade secret information prior to joining Nevro:  "It has come to our attention that David Marco, Jim Makous and Wesley Park retained [Boston Scientific] documents when they left their employment." (California Action, ECF No. 203-7.)  Nevro's attorneys also explained that, "[i]n the case of Mr. Park, the documents were contained on a hard drive that we believe may contain additional [Boston Scientific] documents" and that "Nevro will cooperate with Boston Scientific to determine whether any of the documents were distributed to others within the company."  (*Id.*)

49.    On November 3, 2017, Boston Scientific's counsel sent a letter to Nevro's counsel informing Defendants that, "for the period of time that Mr. Park worked at BSC (2005-08), he retained thousands of documents that on their face, appear to contain BSC confidential and proprietary information" and asked that Nevro "forensically image and search" the files of 33 former Boston Scientific employees then working at Nevro, including No.1 on the list, Kerry Bradley.  (California Action, ECF No. 203-16 (emphasis added).)

50.    In response to these discoveries, on April 27, 2018 Boston Scientific filed a second patent infringement action against Nevro in the District of Delaware, captioned *Boston Scientific Corp., et al. v. Nevro Corp.*, 18-cv-00644 (D. Del.) (the "Delaware II Action").

## VI.    THE TRUTH IS REVEALED

### A.    Armed With Documentary Evidence of Nevro's Trade Secret Theft Boston Scientific Initiates the Delaware II Action

51.    On April 27, 2018, the truth began to emerge when it was revealed that Boston Scientific had initiated the Delaware II Action, its second patent infringement case against Nevro, backed by the substantial documentary evidence of misappropriation Nevro and others had provided during discovery in the California Action.  In that complaint, Boston Scientific

alleged that Nevro's Senza systems "willfully infringe Boston Scientific's patents directed to critical features of SCS systems, including features for programming the implanted device and communicating with and recharging and monitoring the status of the battery within the implantable components of SCS systems."   (Delaware II Action, ECF No. 1 at ¶ 1.) Significantly, the facts alleged in the Delaware Complaint were not mere allegations, but were supported and confirmed by extensive discovery taken in the California Action.  Although much of this discovery remains sealed, publicly available documents confirm that the discovery included tens of thousands of documents relating to Nevro's theft of trade secrets produced by Nevro and its employees, depositions of Thacker, Marco, and Park, and correspondence with Nevro's own counsel in which Nevro's counsel *admitted* that Nevro employees had stolen Boston Scientific trade secrets.

52.     In addition to alleging that Nevro's Senza systems had violated no less than nine of Boston Scientific's U.S. patents, Boston Scientific also asserted claims against Nevro for trade secret misappropriation and tortious interference with contract action.  Indeed, the Delaware II Action complaint detailed a long-running, deceptive scheme by Nevro <u>dating back to at least 2009</u>, whereby Nevro actively recruited and hired dozens of former Boston Scientific employees who stole thousands of documents containing Boston Scientific's confidential, proprietary trade secrets.  In turn, Nevro used that information to develop and improve Nevro's Senza systems, with the full knowledge and awareness of Defendants.

53.     Specifically, the complaint alleged that "<u>at least 48 past employees of Boston Scientific are currently employed by Nevro</u>," and that "[m]any of these Nevro employees are intimately familiar with Boston Scientific's SCS systems and core SCS technologies." (Delaware II Action, ECF No. 1 at ¶ 30 (emphasis added).)  Most critically, however, the complaint further alleged that "<u>one or more of the dozens of former Boston Scientific employees</u> that Nevro has recruited and hired <u>disclosed trade secrets relating to Boston Scientific's spinal cord stimulation ('SCS') systems to Nevro</u>, in violation of those employees' contractual obligations; <u>those trade secrets were</u> the product of substantial investments and treated confidentially by Boston

Scientific and were *of considerable value to Nevro in its efforts to develop an SCS product that competed directly with Boston Scientific's SCS products; and Nevro was aware of and benefited from those disclosures*."  (Delaware II Action, ECF No. 1 at ¶ 1 (emphases added).)

54.     According to Boston Scientific, "Nevro strived to acquire information regarding Boston Scientific's SCS systems and core SCS technologies and its institutional knowledge of the SCS market and SCS business practices from these former Boston Scientific employees." (Delaware II Action, ECF No. 1 at ¶ 30.)  Nevro thereafter intentionally "institutionalized the extensive knowledge of Boston Scientific's patent portfolio" (Delaware II Action, ECF No. 1 at ¶ 32) by using the stolen trade secret information provided by these employees "in connection with its business activities, including its research and development, design, clinical investigation, and testing of the Senza Systems."  (Delaware II Action, ECF No. 1 at ¶ 103 (emphasis added).)

### B.     Documentary Evidence Obtained Through Extensive Discovery Substantiates Nevro's Trade Secret Theft

55.     Four of the 48 former Boston Scientific employees identified in the Delaware II Action are Thacker, Bradley, Park and Lee—*i.e.*, key employees named as inventors or co-inventors of most of the SCS system patents held by both companies—who, before beginning to work for Nevro, "had extensive knowledge of Boston Scientific's neuromodulation patent portfolio, including many of the Asserted Patents, their applications and/or their patent families." (Delaware II Action, ECF No. 1 ¶ 29; *see also id.* ¶¶ 26-28, 100.).  For instance, the complaint in the Delaware II Action alleges regarding Thacker: "During his time at Boston Scientific, Mr. Thacker led Boston Scientific's field clinical engineering group, which helped to develop, administer, and analyze critical studies, de-bugged SCS systems, and worked in conjunction with Boston Scientific's research & development group to develop, test, and commercialize its core SCS technologies."  (Delaware II Action, ECF No. 1 ¶ 27.)

56.     As a condition of his employment with Boston Scientific, Thacker signed a confidentiality agreement that required him to keep confidential during the term of his employment and thereafter, all trade secrets developed or learned during the course of his

employment.  When Thacker left Boston Scientific voluntarily in 2006, he represented to the Company that he did not have in his possession any Boston Scientific-owned property, including proprietary or trade secret documents.  However, unbeknownst to Boston Scientific or Nevro investors, Thacker had taken more than <u>34,000</u> Boston Scientific documents with him, including by copying materials from Boston Scientific-owned thumb drives.  (Delaware II Action, ECF No. 1 ¶¶ 91-94, 96-98.)

57.    The fact that Nevro's senior employees had essentially stolen thousands of documents from Boston Scientific and used them to develop Nevro's "proprietary" technology was well-known to Defendants.  Indeed, on April 18, 2017, <u>Nevro's counsel</u> informed Boston Scientific that "Mr. Thacker in fact took <u>thousands of confidential Boston Scientific documents with him</u>," including "laboratory notebooks detailing the work he performed during the 'Stimulus' clinical trials for Boston Scientific's Precision™ SCS system.  Mr. Thacker also took Boston Scientific-owned thumb drives, actual Precision™ demonstration devices, Physician lead manuals, Physician implant manuals, and Precision™ media kits."  (Delaware II Action, ECF No. 1 ¶ 97.)  "In addition to the laboratory notebooks, <u>the over 34,000 files taken by Mr. Thacker included proprietary data</u> concerning Boston Scientific's research and development, product development plans, manufacturing plans and methods, clinical investigations, patient data, programming specifications, marketing and sales force plans, product component lists, product specifications and diagrams, and budgetary, financial, and cost data."  (Delaware II Action, ECF No. 1 ¶ 98 (emphasis added).)

58.    The documentary evidence submitted in connection with the Delaware II Action also made clear that the trade secrets that Thacker stole from Boston Scientific were disseminated to other Nevro employees upon the commencement of Thacker's tenure with Nevro: "<u>On *multiple occasions*, while employed by Nevro, Mr. Thacker disclosed Boston Scientific's confidential, proprietary information to Nevro.  As one example, on April 16, 2009, Mr. Thacker emailed Nevro employee Wesley Park (also a former Boston Scientific employee) and attached a 50-page document with the file name "SCS_Protocol_Rev.B_3Feb03."  The</u>

attachment was a draft "Stimulus™ Confirmatory Study" authored by Boston Scientific's predecessor Advanced Bionics. Upon information and belief, at the time Mr. Thacker disclosed the Confirmatory Study, Mr. Park was Nevro's Director of Clinical Marketing and responsible for, among other things, leading and managing the U.S. and European clinical trials, including designing studies, selecting study sites, analyzing and interpreting data, and managing field clinical engineers and clinical specialists."  (Delaware II Action, ECF No. 1 ¶ 100; *see also* California Action, ECF No. 202-22 (April 16, 2009 e-mail with attachment sent to Park by Thacker).)

59.     The Delaware II Action also made clear that the stolen information was critical for Boston Scientific's SCS systems: "The Stimulus Confirmatory Study was Boston Scientific's protocol to run the clinical investigation for its Precision™ product, and was a compilation of information necessary for Boston Scientific's clinical investigation, including such confidential information as subject enrollment criteria (e.g., detailed inclusion and exclusion criteria), study design, methodology/testing requirements, and monitoring requirements."  (Delaware II Action, ECF No. 1 ¶ 102.)

60.     Moreover, the timeframe associated with the trade secret theft also supported the pivotal role that the information played in the development of Senza: "Nevro's possession of Boston Scientific's internal clinical investigation protocol for its Precision™ SCS product would have been of value to Nevro, who during the relevant time period was developing its own SCS system, and conducting its own clinical investigations.  Since Nevro had never developed an SCS product before, the Stimulus Confirmatory Study disclosed by Mr. Thacker provided Nevro with a necessary tool to develop its own clinical investigation protocol…. Nevro has used the information provided by Mr. Thacker in connection with its business activities, including in its research and development, design, clinical investigation, and testing of the Senza Systems." (Delaware II Action, ECF No. 1 ¶ 103 (emphasis added)).

61.     The Delaware II Action provided additional evidence of Thacker disseminating confidential Boston Scientific information to Nevro employees: "As another example, on May 4,

2009, Mr. Thacker emailed Nevro employee David Marco (also a former Boston Scientific employee) and attached a 26-page document entitled 'Spinal Cord Stimulator Clinician's Programming System, Module Specification.'   Upon information and belief, at the time Mr. Thacker disclosed the Module Specification to Mr. Marco, Mr. Marco was a Senior Field Clinical Engineer at Nevro and responsible for, among other things, training and programming manuals. Mr. Marco worked at Boston Scientific from 2004 to 2007.  During that time, Mr. Marco helped Boston Scientific complete the clinical trial for the Precision™ SCS product, helped with all phases of equipment troubleshooting, and contributed many ideas for new equipment.  Mr. Marco also taught salesmen and physicians." (Delaware II Action, ECF No. 1 ¶ 104); *see also* California Action, ECF No. 202-24 (May 4, 2009 e-mail with attachment sent to Marco by Thacker).)

### C.   The Market Reacts To The Revelations of Nevro's Trade Secret Theft

62.     Although these misappropriations of trade secrets were not news to Defendants, the filing of the complaint in the Delaware II Action marked the first time the market became aware of Nevro's theft of Boston Scientific's trade secrets and its use of that information to develop and advance its allegedly "proprietary" Senza systems delivering HF10 therapy.

63.     Analysts picked up on this development and reported Boston Scientific's allegations of Nevro's theft to the market.  For example, a Wells Fargo report issued on April 29, 2018, stated:

> According to our patent consultant, the trade secret case would matter if it turns out that any information was taken from BSX and then became critical to Nevro's product development, testing, or approval process.  In that case, the court would try to reverse the unfair advantage as best it could, whether by imposing delays in future product releases, financial repercussions, or other interventions.  (Emphasis in original.)

64.     Upon the market learning for the first time of Nevro's theft and the resulting possibility that the Company's purported intellectual property rights covering its SCS system technologies could be invalidated, Nevro's share price declined $1.46 per share, from a close of

$90.82 per share on April 27, 2018 to a close of $89.36 per share on April 30, 2018 – wiping out $44 million in the Company's market capitalization in one trading day.

65.     On July 2, 2018, Nevro investors were shocked again when Morgan Stanley & Co. downgraded Nevro to "Equal Weight," explaining that "Boston Scientific litigation [] are risks to Senza superiority" and that "potential risks to [Senza] therapy's differentiation later this year warrant the discount."

66.     On this news, Nevro's stock price dropped another $6.62 per share, or 8.29%, from a close of $79.85 per share on June 29, 2018 to a close of $73.23 per share on July 2, 2018, on high trading volume of more than 2 million shares, wiping out $200 million in market capitalization.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

67.     Throughout the Class Period, Defendants issued a series of statements emphasizing a single theme:  Nevro's Senza systems were based on a "novel," "proprietary," "unique," and "truly once in a generation medical technology innovation" that Nevro had "developed," affording the Company a critical edge over its competitors and laying the foundation for explosive growth.

68.     Defendants' statements were materially false and misleading.  In reality, the Company's "development" of its "proprietary" Senza systems delivering HF10 therapy evolved from Nevro's continuous theft of confidential and proprietary trade secret information generated by one of its competitors, institutionalization of that information through strategically poaching Boston Scientific's key patent inventor employees and utilization of that stolen information to develop and advance the trajectory of Senza.

69.     As a result, Nevro's intellectual property was at high risk of being invalidated once Boston Scientific discovered its infringement.  Instead, the entire foundation and continued existence of the Company—whose only product was Senza—was dependent upon Defendants' continued concealment of their perpetration of this misappropriation scheme.

70.     On the first day of the Class Period, Nevro's common stock closed at a share price of $86.63 on August 8, 2017.  Because Defendants successfully concealed that Nevro had, in essence, stolen its sole SCS product from its competitor, the Company's share price steadily increased over time, reaching a Class Period high of $93.31 on October 5, 2017, an average Class Period price of $88.01 and a closing price of $90.82 per share on April 27, 2018–the trading day immediately before the market leaned of the filing of Boston Scientific's complaint in the Delaware II Action.

71.     Once the market learned that Nevro's purportedly "proprietary" product, in fact, had been misappropriated, the enormity of the risk the Company faced from the possibility that all of the patents covering its Senza systems delivering HF10 therapy could be invalidated as a result of Defendants' fraud caused Nevro's share price to drastically decline over the course of just two months from a price of $90.82 per share on April 27, 2018 to a price of $73.23 on July 2, 2018, the first trading day after the end of the Class Period, thereby substantially damaging all Class members.

A.     **Second Quarter 2017 Statements**

72.     On August 7, 2017, after market close, Nevro issued a press release to investors announcing the Company's financial results for the second quarter of 2017.  That press release contained the following misrepresentations by the Company:

> Nevro has <u>developed</u> and commercialized the Senza spinal cord stimulation (SCS) system, an evidence-based neuromodulation platform for the treatment of chronic pain. <u>The Senza System is the only SCS system that delivers Nevro's proprietary HF10 therapy</u>.[18]

---

[18] Every single press release issued by Nevro from this point through the end of the Class Period contained substantially similar misrepresentations regarding the proprietary nature of intellectual property essential to Nevro's ability to sell its only revenue generating product in the United States and contained the claim that Senza had been developed by the Company, including the press releases Defendants issued on August 24, 2017, October 23, 2017, November 6, 2017, December 20, 2017, January 8 and 12, 2018, February 8 and 22, 2018, March 22, 2018, April 23, 2018, and May 2, 7 and 14, 2018.

73.     Also on August 7, 2017, after market close, Nevro filed its Quarterly Report on SEC Form 10-Q for the quarter ended June 30, 2017, which was signed by the Individual Defendants, announcing the Company's second quarter 2017 financial results (the "2Q17 10-Q"). In addition to reporting second quarter revenue, the 2Q17 10-Q stated:

> We have developed and commercialized the Senza spinal cord stimulation (SCS) system, an evidence-based neuromodulation platform for the treatment chronic pain.  Our proprietary paresthesia-free HF10 therapy, delivered by our Senza system, was demonstrated in our SENZA-RCT study to be superior to traditional SCS therapy[.]

74.     As a result of Defendants' misleading statements to investors, Nevro stock gained approximately $4.00 per share, from a close of $82.66 on August 7, 2017 to a close of $86.63 on August 8, 2017.     Moreover, as Defendants continued making substantially similar representations throughout the Class Period, the Company's share price steadily increased over time, reaching a Class Period high of $93.31 on October 5, 2017, and an average Class Period price of $88.01.

75.     Defendants' statements in paragraphs 72 and 73 were materially false and misleading at the times they were made.  At all relevant times throughout the Class Period, Nevro failed to disclose to investors that the Company's Senza systems and HF10 therapy were developed by scientists and engineers that the Company poached from Boston Scientific, and that Nevro's purportedly "proprietary" technology was actually based on tens of thousands of stolen internal Boston Scientific confidential documents and trade secret information. In addition, Defendants intentionally or recklessly misappropriated these trade secrets by utilizing the institutional knowledge of and stolen information provided by these scientists and engineers to develop, advance, and unlawfully obtain patent rights covering Nevro's Senza systems and HF10 therapy.

**B.      Third Quarter 2017 Statements**

76.     On November 6, 2017, after market close, Nevro issued a press release to investors announcing the Company's financial results for the third quarter of 2017.  That press release contained the following misrepresentations by the Company:

> Nevro has <u>developed</u> and commercialized the Senza spinal cord stimulation (SCS) system, an evidence-based neuromodulation platform for the treatment of chronic pain. <u>The Senza System is the only SCS system that delivers Nevro's proprietary HF10 therapy</u>.

77.     Also on November 6, 2017, after market close, Nevro filed its Quarterly Report on SEC Form 10-Q for the quarter ended September 30, 2017, which was signed by the Individual Defendants, announcing the Company's third quarter 2017 financial results (the "3Q17 10-Q").  In addition to reporting second quarter revenue, the 3Q17 10-Q stated:

> We have <u>developed</u> and commercialized the Senza spinal cord stimulation (SCS) system, an evidence-based neuromodulation platform for the treatment chronic pain.  <u>Our proprietary paresthesia-free HF10 therapy, delivered by our Senza system</u>, was demonstrated in our SENZA-RCT study to be superior to traditional SCS therapy[.]

78.     Defendants' statements in paragraphs 76 and 77 were materially false and misleading at the times they were made.  At all relevant times throughout the Class Period, Nevro failed to disclose to investors that the Company's Senza systems and HF10 therapy were developed by scientists and engineers that the Company poached from Boston Scientific, and that Nevro's purportedly "proprietary" technology was actually based on tens of thousands of stolen internal Boston Scientific confidential documents and trade secret information. In addition, Defendants intentionally or recklessly misappropriated these trade secrets by utilizing the institutional knowledge of and stolen information provided by these scientists and engineers to develop, advance, and unlawfully obtain patent rights covering Nevro's Senza systems and HF10 therapy.

C.    **Statements Regarding the FDA's Approval of Senza II**

79.    On January 8, 2018, Nevro issued a press release announcing that Nevro had received approval for the Senza II Spinal Cord Stimulation system—a new iteration of its Senza system that used the same underlying technology in its first Senza system to offer Nevro's HF10 therapy "through a smaller and more refined footprint."  In connection with this announcement, the press release stated:

> The Senza II system delivers Nevro's proprietary HF10 therapy, an SCS therapy that provides electrical pulses to the spinal cord to alleviate pain.  The electrical pulses are delivered by small electrodes on leads that are placed near the spinal cord and are connected to a compact, battery-powered generator implanted under the skin.  HF10 therapy is the only SCS therapy indicated to provide pain relief without paresthesia (a stimulation-induced sensation, such as tingling or buzzing, which is the basis of traditional SCS) and is also the first SCS therapy to demonstrate superiority to traditional SCS for back and leg pain in a comparative pivotal study.

80.    Defendants' statements in paragraph 79 were materially false and misleading at the time they were made.  At all relevant times throughout the Class Period, Nevro failed to disclose to investors that the Company's Senza systems and HF10 therapy were developed by scientists and engineers that the Company poached from Boston Scientific, and that Nevro's purportedly "proprietary" technology was actually based on tens of thousands of stolen internal Boston Scientific confidential documents and trade secret information.  In addition, Defendants intentionally or recklessly misappropriated these trade secrets by utilizing the institutional knowledge of and stolen information provided by these scientists and engineers to develop, advance, and unlawfully obtain patent rights covering Nevro's Senza systems and HF10 therapy.

D.    **Fourth Quarter and Full Year 2017 Statements**

81.    On February 22, 2018, after market close, Nevro issued a press release to investors announcing the Company's financial results for the third quarter of 2017.  That press release contained the following misrepresentations by the Company:

> Nevro has developed and commercialized the SENZA spinal cord stimulation (SCS) system, an evidence-based neuromodulation platform for the treatment of chronic pain.  The SENZA System is the only SCS system that delivers Nevro's proprietary HF10 therapy.

82.     Also on February 22, 2018, after market close, Defendants filed an Annual Report

on SEC Form 10-K, that was signed by the Individual Defendants, reporting financial results for

the year ending on December 31, 2017 (the "2017 10-K"). In addition to reporting full year

revenue, the 2017 10-K stated:

> We believe <u>we have built competitive advantages through our proprietary technology</u>, clinical evidence base, strong track record of execution with over 28,000 patients implanted with Senza, <u>extensive intellectual property</u> and a proven management team with substantial neuromodulation experience.

83.     The 2017 10-K also stated:

> We have <u>developed</u> and commercialized the Senza spinal cord stimulation (SCS) system, an evidence-based neuromodulation platform for the treatment chronic pain. <u>Our proprietary paresthesia-free HF10 therapy, delivered by our Senza system</u>, was demonstrated in our SENZA-RCT study to be superior to traditional SCS therapy[.]

84.     The 2017 10-K also represented:  "We are extending our <u>novel and proprietary

technologies</u> into a series of product enhancements with the goal of improving the treatment of

chronic pain."

85.     In the 2017 10-K, Defendants further claimed:

> The Senza system is approved to create electrical impulses from 2 HZ to 10,000 Hz, including <u>our proprietary HF10 therapy</u>, which allows for pain relief without paresthesia. <u>HF10 therapy delivers proprietary waveforms at 10,000 Hz pulse rate</u> with a statistically driven and clinically verified programming algorithm

86.     Also on February 22, 2018, after market close, during an earnings call discussing

Nevro's financial results for the fourth quarter and full year of 2017, Elghandour lauded the

Company's "truly once in a generation medical technology innovation":

> I'm incredibly proud of what we accomplished as a team in 2017 and I'm equally excited about our future.  At our core Nevro's comprise[d] of exceptional people, *a truly once in a generation medical technology innovation* and a culture that focuses on allowing everyone to do what they do best every day.

87.     As a result of Defendants' statements, Nevro stock gained $4.13 per share, from a

close of $79.65 on February 22, 2018 to a close of $83.78 on February 23, 2018, increasing the

Company's market capitalization by $124 million.  Over the next several weeks, Nevro's stock price continued to increase, trading in the low $90s by mid-April 2018.

88.    Defendants' statements in paragraphs 81 through 85 were materially false and misleading at the time they were made.  At all relevant times throughout the Class Period, Nevro failed to disclose to investors that the Company's Senza systems and HF10 therapy were developed by scientists and engineers that the Company poached from Boston Scientific, and that Nevro's purportedly "proprietary" technology was actually based on tens of thousands of stolen internal Boston Scientific confidential documents and trade secret information.  In addition, Defendants intentionally or recklessly misappropriated these trade secrets by utilizing the institutional knowledge of and stolen information provided by these scientists and engineers to develop, advance, and unlawfully obtain patent rights covering Nevro's Senza systems and HF10 therapy.

89.    Defendant Elghandour's statements in paragraph 86 were materially false and misleading at the time they were made.  At all relevant times throughout the Class Period, Nevro failed to disclose to investors that the Company's Senza systems and HF10 therapy were developed by scientists and engineers that the Company poached from Boston Scientific, and that Nevro's purportedly "truly once in a generation medical technology innovation" was actually based on tens of thousands of stolen internal Boston Scientific confidential documents and trade secret information.  In addition, Defendants intentionally or recklessly misappropriated these trade secrets by utilizing the institutional knowledge of and stolen information provided by these scientists and engineers to develop, and unlawfully obtain patent rights covering, Nevro's Senza systems and HF10 therapy.

### E.    First Quarter 2018 Statements

90.    On May 7, 2018, after market close, Nevro issued a press release to investors announcing the Company's financial results for the first quarter of 2018.  That press release contained the following misrepresentations by the Company:

> Nevro has <u>developed</u> and commercialized the Senza spinal cord stimulation (SCS) system, an evidence-based neuromodulation platform for the treatment of chronic pain. <u>The Senza System is the only SCS system that delivers Nevro's proprietary HF10 therapy</u>.

91.     Also on May 7, 2018, after market close, Nevro filed its Quarterly Report on SEC Form 10-Q for the quarter ended March 31, 2018, which was signed by the Individual Defendants, announcing the Company's third quarter 2017 financial results (the "1Q18 10-Q"). In addition to reporting second quarter revenue, the 1Q18 10-Q stated:

> We have <u>developed</u> and commercialized the Senza spinal cord stimulation (SCS) system, an evidence-based neuromodulation platform for the treatment chronic pain. <u>Our proprietary paresthesia-free HF10 therapy, delivered by our Senza system</u>, was demonstrated in our SENZA-RCT study to be superior to traditional SCS therapy[.]

92.     <u>The 1Q18 10-Q also represented</u>:

> Although <u>we have procedures in place that seek to prevent our employees and consultants from using the intellectual property, proprietary information, know-how or trade secrets of others in their work for us</u>, we may in the future be subject to claims that we caused an employee to breach the terms of his or her non-competition or non-solicitation agreement, or that we or these individuals have, inadvertently or otherwise, used or disclosed the alleged trade secrets or other proprietary information of a former employer or competitor.  Litigation may be necessary to defend against these claims. . . . If our defense to those claims fails, in addition to paying monetary damages, a court could prohibit us from using technologies or features that are essential to our products, if such technologies or features are found to incorporate or be derived from the trade secrets or other proprietary information of the former employers.[19]

93.     Defendants' statements in paragraphs 90 and 91 were materially false and misleading at the times they were made.  At all relevant times throughout the Class Period, Nevro failed to disclose to investors that the Company's Senza systems and HF10 therapy were developed by scientists and engineers that the Company poached from Boston Scientific, and that Nevro's purportedly "proprietary" technology was actually based on tens of thousands of stolen internal Boston Scientific confidential documents and trade secret information.  In addition, Defendants intentionally or recklessly misappropriated these trade secrets by utilizing

---

[19] Substantially similar statements also appeared in Nevro's 2Q17 10-Q, 3Q17 10-Q, and 2017 10-K.

the institutional knowledge of and stolen information provided by these scientists and engineers to develop, advance, and unlawfully obtain patent rights covering Nevro's Senza systems and HF10 therapy.

94.   Defendants' statements in paragraph 92 also were materially false and misleading at the times they were made.  At all relevant times throughout the Class Period, Nevro failed to disclose to investors that the Company's Senza systems and HF10 therapy were developed by scientists and engineers that the Company poached from Boston Scientific, that the Company did not abide by the procedures it had in place, if any, or seek to prevent its employees "from using the intellectual property, proprietary information, know-how or trade secrets of others in their work for [the Company]" and that Nevro's purportedly "proprietary" technology was actually based on tens of thousands of stolen internal Boston Scientific confidential documents and trade secret information.  In addition, Defendants intentionally or recklessly misappropriated these trade secrets by utilizing the institutional knowledge of and stolen information provided by these scientists and engineers to develop, advance, and unlawfully obtain patent rights covering Nevro's Senza systems and HF10 therapy.

## VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

95.   As alleged above, numerous facts raise a strong inference that before, during and after the Class Period, Defendants knew, or were severely reckless in disregarding, the true facts regarding the non-proprietary nature of Nevro's sole product, Senza.  Remarkably, the fact that Defendants' were aware of the majority of the systemic misappropriations of Boston Scientific's confidential and proprietary trade secret information during the Class Period is evidenced by the fact that most of these thefts were revealed by the Company's own attorneys.  These facts include, in addition to the allegations set forth above, the following:

96.   *Prior to the commencement of the Class Period, Defendants misappropriated Boston Scientific's confidential and proprietary trade secret information by poaching at least six key employees from Boston Scientific, four of whom are essential patent inventors for both competitor companies.*

97.     Contrary to Nevro's emphatic claims that it had "developed" a "proprietary" high-frequency SCS technology that gave it a competitive edge in the market, in reality Nevro developed Senza using stolen technology developed by scientists while working for one of Nevro's main competitors, Boston Scientific.

98.     Indeed, beginning no later than August 2007, Nevro began hiring dozens of former Boston Scientific key SCS patent inventors, product developers, and other employees with critical industry knowledge and used them to further the development of Senza.    In particular, six key former Boston Scientific employees–Makous, Thacker, Park, Marco, Bradley and Lee–each worked extensively on Boston Scientific's SCS technologies and also were <u>critical</u> to the development of Nevro's Senza product.    In fact, <u>four</u> of these six individuals—namely, Makous, Thacker, Park and Bradley—invented or co-invented SCS systems patents for <u>both</u> companies.    Further, <u>five</u> of these six employees—Makous, Thacker, Park, Marco, and Lee—each admittedly stole documents containing critical proprietary and confidential trade secret information concerning Boston Scientific's SCS systems and brought those documents to Nevro, which were accessed and used during the time that the Company was developing Senza.

99.     *During the Class Period, <u>Nevro's own attorneys</u> confirm Defendants' knowledge of Nevro's misappropriations.*    As detailed above, no later than August 2017, Nevro's own outside counsel was compelled to disclose evidence demonstrating Nevro's misappropriation of Boston Scientific's confidential and proprietary trade secrets.    Beginning on August 18, 2017, Nevro's counsel confirmed in a series of emails and letters exchanged with counsel for Boston Scientific that various key former Boston Scientific employees hired by Nevro had stolen documents and trade secrets from Boston Scientific and brought them to Nevro.    Accordingly, at a minimum, Defendants were aware of these key facts by no later than August 2017, and likely were intimately familiar with this trade secret theft years earlier during the active development of Senza.

100.     *Nevro's Senza system—the Company's only product and sole source of revenue—was <u>the entirety of Nevro's operations</u>.*    The allegations in this Complaint concern the core

operations of Nevro such that Defendants indisputably would have been aware of the true facts belying their false statements.   Nevro is a single-product company—all of its revenue comes from sales of Senza, a product that Nevro first introduced in the United States market only two years prior to the start of the Class Period.   Consequently, Defendants Elghandour and Galligan clearly would have had intimate and detailed knowledge of all aspects of the Company's development of Senza.

## IX.   CLASS ACTION ALLEGATIONS

101.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Nevro common stock between August 8, 2017 and June 29, 2018, inclusive, and who were damaged thereby (the "Class").  Excluded from the  Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

102.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Nevro's common stock actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Nevro shares were traded publicly during the Class Period on the NYSE.   During the Class Period, Nevro had over 30 million shares of common stock outstanding.   Record owners and other members of the Class may be identified from records maintained by Nevro or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

103.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

104.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

105.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b.  whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Nevro; and

      c.  to what extent the members of the Class have sustained damages and the proper measure of damages.

106.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    UNDISCLOSED ADVERSE FACTS

107.    The market for Nevro's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Nevro common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Nevro's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Nevro, and have been damaged thereby.

108.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Nevro's common stock, by publicly issuing false and/or misleading

1   statements and/or omitting to disclose material facts necessary to make Defendants' statements,

2   as set forth herein, not false and/or misleading.   The statements and omissions were materially

3   false and/or misleading because they failed to disclose material adverse information regarding

4   the Company's Senza technology and/or misrepresented the truth about Nevro's business,

5   operations, and prospects as alleged herein.

6        109.   At all relevant times, the material misrepresentations and omissions particularized

7   in this Complaint directly or proximately caused, or were a substantial contributing cause of, the

8   damages sustained by Plaintiff and other members of the Class.   As described herein, during the

9   Class Period, Defendants made or caused to be made a series of materially false and/or

10  misleading statements about Nevro's technology, business, practices, and prospects.   These

11  material misstatements and/or omissions had the cause and effect of creating in the market an

12  unrealistically positive assessment of the Company and its business, thus causing the Company's

13  common stock to be overvalued and artificially inflated or maintained at all relevant times.

14  Defendants' materially false and/or misleading statements during the Class Period resulted in

15  Plaintiff and other members of the Class purchasing the Company's common stock at artificially

16  inflated prices, thus causing the damages complained of herein when the truth was revealed.

17  **XI.**   **LOSS CAUSATION**

18       110.   During the Class Period, as detailed herein, Defendants engaged in a scheme to

19  deceive the market and a course of conduct that artificially inflated the prices of Nevro's

20  common stock and operated as a fraud or deceit on Class Period purchasers of Nevro's common

21  stock by failing to disclose to investors that the Company's statements concerning its Senza

22  technology were materially misleading and misrepresented material information.   When

23  Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to

24  the market, the prices of Nevro's common stock fell significantly as the prior inflation came out

25  of the Company's stock price.   As a result of their purchases of Nevro common stock during the

26  Class Period, Lead Plaintiff and other Class members suffered economic loss, *i.e.*, damages,

27  under the federal securities laws.

28

111.   By failing to disclose that Nevro's Senza system was not truly built on "proprietary" technology, but rather on technology stolen from Boston Scientific, Defendants presented a false and misleading picture of Nevro's business and financial success.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Nevro to conceal the truth.

112.   Defendants' false and misleading statements had the intended effect and caused Nevro's common stock to trade at artificially inflated levels throughout the Class Period, with Nevro common stock reaching as high as $93.31 on October 5, 2017.  On the trading day before the truth of Defendants' fraud was first revealed, Nevro's common stock closed at $90.82 per share.

113.   Disclosures between April 27, 2018 and July 2, 2018, revealed to the market the false and misleading nature of Defendants' statements and omissions.  On Friday, April 27, 2018, Boston Scientific filed the Delaware II Action revealing details of Nevro's theft of its trade secrets and use of those trade secrets in the development of Senza.  The filing of the Delaware II Action was reported and discussed in a Wells Fargo analyst report over that weekend on April 29, 2018.  On April 30, 2018—the next trading day after the lawsuit was filed—Nevro's stock price dropped from $90.82 to $89.36 per share, a drop of $1.46.

114.   Then, on July 2, 2018, Morgan Stanley issued a report downgrading Nevro's stock to "Equal Weight," explaining that "Boston Scientific litigation [] are risks to Senza superiority" and that "potential risks to [Senza] therapy's differentiation later this year warrant the discount." Morgan Stanley's downgrade was further disseminated to the market through investment websites such as Benzinga.com and SeekingAlpha.com, both of which reported on the downgrade, and no other significant news came out about Nevro on July 2, 2018 or, indeed, during the preceding week.  On the news, Nevro's stock price dropped $6.62 per share, or 8.29%, from a close of $79.85 per share on June 29, 2018 to a close of $73.23 per share on July 2, 2018, on unusually high trading volume of more than 2 million shares.  By comparison, in the

preceding five trading days, Nevro's stock had traded between 214,000 and 318,000 shares per day.

115.    The drastic decline in the price of Nevro's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Nevro's common stock price declines negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Nevro's common stock and the subsequent decline in the value of Nevro's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

116.    The market for Nevro's common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Nevro's common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Nevro's common stock and market information relating to Nevro, and have been damaged thereby.

117.    During the Class Period, the artificial inflation of Nevro's common stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Nevro's technology, business, operations, and results.  These material misstatements and/or omissions created an unrealistically positive assessment of the Company's technology and its business, thus causing the price of the Company's common

1   stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the

2   value of the Company stock.  Defendants' materially false and/or misleading statements during

3   the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's

4   common stock at such artificially inflated prices, and each of them has been damaged as a result.

5   118.   At all relevant times, the market for Nevro's common stock was an efficient

6   market for the following reasons, among others:

7   a.   Nevro was listed and actively traded on the NYSE, a highly efficient and

8   automated market;

9   b.   As a regulated issuer, Nevro filed periodic public reports with the SEC and/or the

10  NYSE;

11  c.   Nevro regularly communicated with public investors via established market

12  communication mechanisms, including through regular dissemination of press

13  releases on the national circuits of major newswire services and through other

14  wide-ranging public disclosures, such as communications with the financial press

15  and other similar reporting services; and/or

16  d.   Nevro was followed by securities analysts employed by brokerage firms who

17  wrote reports about the Company, and these reports were distributed to the sales

18  force and certain customers of their respective brokerage firms.  Each of these

19  reports was publicly available and entered the public marketplace.

20  119.   As a result of the foregoing, the market for Nevro's common stock promptly

21  digested current information regarding Nevro from all publicly available sources and reflected

22  such information in Nevro's stock price.  Under these circumstances, all purchasers of Nevro's

23  stock during the Class Period suffered similar injury through their purchase of Nevro's stock at

24  artificially inflated prices and a presumption of reliance applies.

25  120.   A Class-wide presumption of reliance is also appropriate in this action under the

26  Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

27  (1972), because the Class's claims are, in large part, grounded on Defendants' material

28  

AMENDED CLASS ACTION COMPLAINT
Case No. 18-cv-05181-VC                                                                                          -38-

1   misstatements and/or omissions.  Because this action involves Defendants' failure to disclose

2   material adverse information regarding the Company's Senza technology and/or its business

3   operations and prospects—information that Defendants were obligated to disclose—positive

4   proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld

5   be material in the sense that a reasonable investor might have considered them important in

6   making investment decisions.  Given the importance of the Class Period material misstatements

7   and omissions set forth above, that requirement is satisfied here.

8   **XIII.   NO SAFE HARBOR**

9          121.   The statutory safe harbor provided for forward-looking statements under certain

10  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

11  The statements alleged to be false and misleading herein all relate to then-existing facts and

12  conditions.   In addition, to the extent certain of the statements alleged to be false may be

13  characterized as forward looking, they were not identified as "forward-looking statements" when

14  made and there were no meaningful cautionary statements identifying important factors that

15  could cause actual results to differ materially from those in the purportedly forward-looking

16  statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply

17  to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

18  looking statements because at the time each of those forward-looking statements was made, the

19  speaker had actual knowledge that the forward-looking statement was materially false or

20  misleading, and/or the forward-looking statement was authorized or approved by an executive

21  officer of Nevro who knew that the statement was false when made.

22

23

24

25

26

27

28

XIV.   **CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT**

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

122.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

123.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Nevro's common stock at artificially inflated and/or maintained prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

124.   Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Nevro's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

125.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Nevro's technology, business practices and prospects, as specified herein.   Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure

1   investors of Nevro's value and performance and continued growth, which included the making

2   of, or the participation in the making of, untrue statements of material facts and/or omitting to

3   state material facts necessary in order to make the statements made about Nevro's technology

4   and its business operations and future prospects in light of the circumstances under which they

5   were made, not misleading, as set forth more particularly herein, and engaged in transactions,

6   practices and a course of business which operated as a fraud and deceit upon the purchasers of

7   the Company's common stock during the Class Period.

8       126.   Each of the Individual Defendants' primary liability and controlling person

9   liability arises from the following facts: (i) the Individual Defendants were high-level executives

10  and/or directors at the Company during the Class Period and members of the Company's

11  management team or had control thereof; (ii) each of these Defendants, by virtue of their

12  responsibilities and activities as a senior officer and/or director of the Company, was privy to and

13  participated in the day to day operation of the Company and the dissemination of the materially

14  false and misleading statements identified herein; (iii) each of these Defendants enjoyed

15  significant personal contact and familiarity with the other Defendants and was advised of, and

16  had access to, other members of the Company's management team, internal reports and other

17  data and information about the Company's business and technology at all relevant times; and (iv)

18  each of these Defendants was aware of the Company's dissemination of information to the

19  investing public which they knew and/or recklessly disregarded was materially false and

20  misleading.

21      127.   Defendants had actual knowledge of the misrepresentations and/or omissions of

22  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

23  ascertain and to disclose such facts, even though such facts were available to them.   Thus,

24  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly

25  and for the purpose and effect of concealing Nevro's misappropriations, business practices, and

26  prospects from the investing public and supporting the artificially inflated and/or maintained

27  price of its stock.  As demonstrated by Defendants' overstatements and/or misstatements of the

28

1    Company's technology, business, operations, practices, and prospects throughout the Class

2    Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or

3    omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining

4    from taking those steps necessary to discover whether those statements were false or misleading.

5         128.    As a result of the dissemination of the materially false and/or misleading

6    information and/or failure to disclose material facts, as set forth above, the market price of

7    Nevro's common stock was artificially inflated during the Class Period.  In ignorance of the fact

8    that market prices of the Company's common stock were artificially inflated, and relying directly

9    or indirectly on the false and misleading statements made by Defendants, or upon the integrity of

10   the market in which the stock trades, and/or in the absence of material adverse information that

11   was known to or recklessly disregarded by Defendants, but not disclosed in public statements by

12   Defendants during the Class Period, Plaintiff and the other members of the Class acquired

13   Nevro's common stock during the Class Period at artificially high prices and were damaged

14   thereby.

15        129.    At the time of said misrepresentations and/or omissions, Plaintiff and other

16   members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff

17   and the other members of the Class and the marketplace known the truth regarding the problems

18   that Nevro was experiencing, which were not disclosed by Defendants, Plaintiff and other

19   members of the Class would not have purchased or otherwise acquired their Nevro common

20   stock, or, if they had acquired such stock during the Class Period, they would not have done so at

21   the artificially inflated prices which they paid.

22        130.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange

23   Act and Rule 10b-5 promulgated thereunder.

24        131.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

25   the other members of the Class suffered damages in connection with their respective purchases

26   and sales of the Company's common stock during the Class Period.

27

28

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

132.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

133.     The Individual Defendants acted as controlling persons of Nevro within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's technology and operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

134.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

135.     As set forth above, Nevro and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

1   **XV.    PRAYER FOR RELIEF**

2           136.    WHEREFORE, Plaintiff prays for relief and judgment, as follows:

3           a.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the

4   Federal Rules of Civil Procedure on behalf of the Class defined herein;

5           b.    Awarding Plaintiff and the other members of the Class damages in an amount

6   which may be proven at trial, together with interest thereon;

7           c.    Awarding Plaintiff and the other members of the Class pre-judgment and post-

8   judgment interest, as well as their reasonable attorneys' and experts' witness fees and other

9   costs; and

10          d.    Awarding such other relief as this Court deems appropriate.

11  **XVI.   JURY TRIAL DEMANDED**

12
13          137.    Plaintiff hereby demands a trial by jury.

14
15  DATED:  January 18, 2019           **SAXENA WHITE PA**

16                                     */s/ Steven B. Singer*

17                                     MAYA SAXENA
                                       (msaxena@saxenawhite.com)
18                                     JOSEPH E. WHITE, III
                                       (white@saxenawhite.com)
19                                     LESTER R. HOOKER (Bar No. 241590)
                                       (lhooker@saxenawhite.com)
20                                     150 East Palmetto Park Road, Suite 600
                                       Boca Raton, Florida 33432
21                                     Tel:    (561) 394-3399
                                       Fax:    (561) 394-3382
22
                                       -and-
23
                                       STEVEN B. SINGER
24                                     (ssinger@saxenawhite.com)
                                       JOSHUA H. SALTZMAN
25                                     (jsaltzman@saxenawhite.com)
                                       SARA DILEO
26                                     (sdileo@saxenawhite.com)
                                       10 Bank St., 8th Floor
27                                     White Plains, New York 10606
                                       Tel:    (914) 437-8551

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fax:     (888) 631-3611

*Counsel for Lead Plaintiff and the Class*

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

DAVID R. STICKNEY (Bar No. 188574)
(davids@blbglaw.com)
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

-and-

AVI JOSEFSON
(avi@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Local Counsel for Lead Plaintiff and the Class*

---

AMENDED CLASS ACTION COMPLAINT
Case No. 18-cv-05181-VC

-45-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on January 18, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 18, 2019.

*/s/ Steven B. Singer*